Filed 8/31/21  P. v. Cabrera CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ALEJANDRO ANTONIO CABRERA et al.,<br><br>    Defendants and Appellants. | 2d Crim. No. B289788<br>(Super. Ct. No. 2013036313)<br>(Ventura County) |

Christian Rodriguez and Alejandro Antonio Cabrera appeal from judgments entered after a jury had convicted them of first degree murder (count 1, victim Lopez) and had convicted Rodriguez of first degree attempted murder (count 2, victim J.G.). (Pen. Code, §§ 187, subd. (a); 189, subd. (a); 664, subd. (a).)[1]  The jury found true (1) allegations that appellants had discharged firearms (§ 12022.53, subds. (c), (d), (e)(1)); and (2) special

_____

[1] All statutory references are to the Penal Code unless otherwise stated.

circumstances allegations that they had intentionally killed the victim to further the activities of a criminal street gang (§ 190.2, subd. (a)(22)).  In addition, the jury found true an allegation that Rodriguez had personally inflicted great bodily injury upon the victim of the attempted murder (§ 12022.7, subd. (a)) and had committed that offense for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).

*Sentences*

For the murder Rodriguez was sentenced to life without the possibility of parole plus a consecutive term of 25 years to life for the firearm enhancement pursuant to section 12022.53, subdivision (d), plus a consecutive term of 20 years for the firearm enhancement pursuant to section 12022.53, subdivision (c).  For the attempted murder he was sentenced to a consecutive term of 15 years to life plus a consecutive term of 25 years to life for the firearm enhancement pursuant to section 12022.53, subdivision (d).

Cabrera was not charged with the attempted murder.  For the murder he was sentenced to life without the possibility of parole plus a consecutive term of 25 years to life for the firearm enhancement pursuant to section 12022.53, subdivisions (d) and (e)(1), plus a consecutive term of 20 years for the firearm enhancement pursuant to section 12022.53, subdivision (c).  The court stated, "So life without the possibility of parole plus 45 years."

As to both murder convictions, the trial court erred in imposing a 20-year determinate term for the firearm enhancement pursuant to section 12022.53, subdivision (c).  This term is in addition to the 25-year-to-life term for the firearm enhancement imposed for the same crime pursuant to section

2

12022.53, subdivisions (d) and (e)(1).  The double punishment violates section 12022.53, subdivision (f), which provides, "Only one additional term of imprisonment under this section shall be imposed per person for each crime."

*Contentions*

Rodriguez contends that the trial court erroneously denied his motion to exclude statements he had made to informants while he was incarcerated in county jail.  Rodriguez maintains that law enforcement's use of the informants violated his constitutional right to due process.  In addition, he claims that (1) the matter should be remanded to the trial court to give it an opportunity to exercise discretion whether to strike the firearm enhancements pursuant to recently amended subdivision (h) of section 12022.53, and (2) the trial court erroneously imposed fines and assessments without finding that Rodriguez had the ability to pay them.

Cabrera contends:  (1) the trial court abused its discretion in denying his motion to sever his trial from Rodriguez's trial; (2) even if the trial court did not abuse its discretion, the consolidation of the trials denied him due process of law; and (3) the trial court erroneously admitted against Cabrera the incriminating statements made by Rodriguez to informants.  The statements were admitted under the declaration against penal interest exception to the hearsay rule.  (Evid. Code, § 1230.)

*Decision*

On our own motion, we modify the judgments to strike the 20-year determinate terms for the firearm enhancements imposed pursuant to section 12022.53, subdivision (c).  In all other respects, we will affirm.  We will direct the trial court to amend the abstracts of judgment.

*Facts, Excluding Appellants' Statements,*
*Relating to Murder Conviction (Count 1, Victim Lopez)*

One afternoon in March 2013, J.D. was driving her vehicle in the El Rio area of Ventura County. She saw a man, later identified as Josue Lopez, walking by himself down the street. Two men ran toward him. Lopez "turned to run away." The arms of both men were "held . . . straight out" and were pointed at Lopez. J.D. heard about six "pops" in "quick succession" and saw "smoke coming from [the mens'] arms." The men were about six to ten feet away from Lopez when she saw the smoke. Lopez fell to the street, and the men ran away. Lopez had been shot in the back. The wound was fatal. Another bullet grazed Lopez's right hip.

Lopez was 16 years old. His moniker was "Lil Risky." A gang expert did not know whether Lopez was a gang member. After Lopez's death, members of the El Rio Trouble Street (El Rio) criminal street gang held a memorial service for him.

At the scene of the shooting, sheriff's deputies found two .38 caliber "spent bullets" on Lopez's body. They found a "fresh" bullet hole in the door of a parked car. The hole had been made by a .22 caliber bullet. Deputies recovered the bullet.

Five days before the shooting, appellant Rodriguez turned 18 years old. He was a member of the Colonia Chiques (Colonia) criminal street gang. His gang moniker was "Pooh Bear." Colonia and El Rio are "[e]nemies." A gang expert testified, "There's been numerous shooting incidents between both gangs."

Ten days after the shooting, a police officer saw Rodriguez trying to hide behind a dumpster. In the dumpster the officer found "a Rossi .38 Special revolver . . . with five .38 Special caliber rounds loaded inside the gun." Rodriguez was arrested

4

for carrying a loaded firearm. DNA on the revolver matched Rodriguez's DNA. A forensic scientist test-fired the revolver. She opined that the two .38 caliber spent bullets found on Lopez's body had been fired from the revolver.

Appellant Cabrera was also a Colonia gang member. His gang moniker was "bleedr" or "bleeder." Five days after the police had arrested Rodriguez, officers made a traffic stop of a vehicle that Cabrera was driving. Cabrera got out and ran. The officers pursued him. Cabrera "dropp[ed] down on the ground," and the officers handcuffed him. On the ground a few feet away, they found a firearm. It was a "Ruger .22-caliber revolver," known as a "Ruger Single-Six," that "was loaded with six live rounds of .22-caliber ammo." DNA on the Ruger matched Cabrera's DNA. The Ruger was a "single-action revolver," which means that a person must "manually pull the hammer back" each time the revolver is fired. Rodriguez's Rossi, on the other hand, was a double-action revolver – "one pull of the trigger will cock the hammer back and then release the trigger."

A forensic scientist testified that "some of the class characteristics" of the .22 caliber bullet recovered from the door of the parked car "were consistent with the class characteristics from the .22-caliber Ruger firearm." The bullet could have been fired from the Ruger, but she was unable to determine whether it had in fact been fired from the Ruger. She noted, "There [are] a number of other firearms that have the same class characteristics as the Ruger." She was able to "rule out a number of other firearms" that did not share the Ruger's class characteristics.

*Facts, Excluding Rodriguez's Statements, Relating to*
*Attempted Murder Conviction (Count 2, Victim J.G.)*

One night in March 2013, J.G. stopped his vehicle at a stop sign in the "Colonia neighborhood" of Oxnard. The windows were down and J.G. was listening to fairly loud music. Five days earlier, Lopez (the victim in count 1) had been shot.

A man came to the vehicle's passenger-side window and said to J.G., "'What's up, fool?'" "'Where you from?'" The man pointed a firearm at J.G.'s head. J.G. "hit the gun down with [his] right hand." The man shot J.G. in the side just below his ribcage. Doctors told J.G. that the bullet "had destroyed [his] liver and also grazed . . . [his] intestines."

As J.G. drove away, he heard multiple gunshots. The windows of his vehicle were "[s]hot out." The vehicle had three bullet holes. J.G. believed that about five shots had been fired.

The police recovered a bullet that had penetrated the back of the front passenger's seat of J.G.'s vehicle. A forensic scientist opined that the bullet had been fired from Rodriguez's Rossi revolver.

*Rodriguez's Statements Concerning the Murder of Lopez*

Deputy Albert Ramirez was informed that Rodriguez had been arrested for possession of a loaded .38 Rossi revolver and that the bullets recovered from Lopez's body "were possibly .38 rounds." Based on this information, he arranged for a confidential informant (CI no. 1) to be placed in the cell next to Rodriguez's cell. The informant was a former member of Colonia. Deputy Ramirez recorded conversations between the informant and Rodriguez.

Rodriguez "introduced" himself to the informant as "Pooh Bear from Colonia." He boasted to the informant about the

6

killing of Lopez: "This dude, the one from El Rio, I let him have them all, dude. All of them." "I asked him, 'what's up, fool? Where you from, fool?' [He replied,] 'El Rio.' 'Oh, really fagot?' . . . My hommie . . . Bleeder had his right here. . . . It was a 22 [caliber firearm]." "The .38 [caliber firearm]. Pow, pow, pow. I let all of them go. Pow, pow, pow. Here you go, faggot. . . . You could see them [the bullets] going through." "Fuck! Mother fucker, that's what you get, faggot. And I just took off." "[The victim] was barely 16 but he had balls for saying [he was from] El Rio."

Rodriguez said that his "hommie," i.e., Bleeder, had "a six" – a Ruger Single-Six – "[t]he ones that you pull back." "We started to shoot at him [Lopez]." Four days after Rodriguez was arrested, the police "got my hommie."

Deputy Ramirez placed another confidential informant (CI no. 3) in the cell next to Rodriguez's cell. The informant had been a member of Colonia. Rodriguez "introduce[ed] himself as Pooh Bear . . . from Colonia." Rodriguez told the informant, "[T]hat day [the day Lopez was shot] I had a 38, he [his accomplice] had a 22." Rodriguez referred to his accomplice as "Bleeder, Alex." Cabrera's first name is Alejandro. Rodriguez continued: When Lopez said he was from El Rio, "[W]e just started dumping on him, boom, boom . . . ." Alex "was it, he was the one that had the fucking idea." Alex "dump[ed]" on Lopez. The informant said, "[I]t was all his [Alex's/Bleeder's] idea." Rodriguez replied, "Yeah."

*Rodriguez's Statements Concerning Attempted Murder*

Rodriguez boasted to CI no. 1 about his shooting of J.G: "I came down on another jackass. . . . [A] car went by, dude . . . . To . . . me it . . . was probably Lames, fool. . . . I told my brother,

'hey, fool, give me a ride.' We got in the van, fool, we chased him. I got off, 'where you from fool?' And he stepped on it right away. Pow, pow, pow. Well, I let the, all five [rounds] go. I was able to hit him like two (2) or three (3) [times]." "[T]he jackass was able to get to the hospital." "Lames" means a rival gang member.

### Cabrera's Statements

Confidential informant no. 2 (CI no. 2) was housed in the same jail section as Cabrera. CI no. 2 was a former member of Colonia. He gave Deputy Ramirez notes written by Cabrera concerning the shooting of Lopez. In prison slang such notes are referred to as "kites."[2] Cabrera wrote the kites when he was in jail for possession of the loaded Ruger revolver, not for the killing of Lopez. Some of the kites were signed, "Bleedr." Cabrera left out the "e" before the "r" because "E.R." are the initials of the rival gang, El Rio. The trial court excluded some of the kites. (See *post*, p. 19.)

Cabrera wrote: "Fuk E.R. That River Rat that got smoked was L. Risky." "Yeah that fool Lil Risky was a straight River Rat. No doubt about it." "I don't think they [the police] know who killed that river rat." "Smoked" means "shot." "River rat" is a "derogatory term that Colonia gang members use to refer to El Rio gang members." In Spanish "rio" means river.

In another kite Cabrera said, "'All I'm worried about is that river rat shit, [be]cause I don't want these "hurras" to know anything that could come back to me.'" "Hurras" means the police. Deputy Ramirez explained, "[H]ere [Cabrera is] saying

---

[2] Deputy Ramirez testified: "[K]ites are pieces of paper with written information that inmates often use to communicate with each other." "The inmate will read it and then will dispose of it normally by flushing it down the toilet."

that he's worried . . . the investigators will link him to [the] shooting" of Lopez. Cabrera did not say that he had participated in the shooting.

In the kites Cabrera also said, "'[W]e aim to kill,'" meaning that when Colonia gang members shoot, "their intention is to kill rival gang members." Cabrera said he was "'an active homie,'" meaning that "he's an active gang member." Cabrera bragged, "'I gang bang 24-7,'" meaning "I'm an active gang member 24 hours a day, seven days a week."

*Rodriguez's Trial Testimony*

Rodriguez testified as follows: When he saw the police, he threw the Rossi .38 revolver into a dumpster. He received the firearm two days earlier and did not know it had been used in a shooting.

He was arrested for carrying a loaded firearm and was incarcerated in the county jail. Four days after his arrest, he met CI no. 1. Rodriguez "was scared" of him because he talked about the "jail things that he did, the things he participated in from prison, stabbings, beating up people, stuff like that." Rodriguez told CI no. 1 that he was "involved in a shooting in El Rio" because he did not want "to look weak." He was not involved in that shooting. Nor was he involved in the shooting of J.G.

Rodriguez bragged about the Lopez shooting to C.I. no. 3 because he was afraid of him. He believed that C.I. no. 3 was connected to the Mexican Mafia and had the power to put a "green light" on someone. If you are subject to a green light, gang members "either got to hurt you, beat you up, stab you, stuff like that."

CI no. 3 never said Rodriguez was required to talk to him and "never actually forced [Rodriguez] to say anything."

9

When Rodriguez refers to "Bleedr" and "Alex," he is referring to Cabrera.

*Rodriguez's Pretrial Motion to Exclude*
*His Statements to Informants*

Rodriguez filed a motion to exclude his statements to the informants. He claimed that the use of informants to elicit incriminating statements violated his Sixth Amendment right to counsel.

In their written opposition to the motion, the People argued that when Rodriguez made the statements to the informants, he had "not yet [been] charged with murder or attempted murder" and "was merely serving time for weapons possession and graffiti vandalism." Therefore, his statements to the informants were admissible because "his Sixth Amendment rights had not yet attached."

The trial court ruled, "I agree with the People, the Sixth Amendment's case specific and it doesn't attach to this case until he's actually charged, even though he may be charged with some other case." Accordingly, the trial court denied the motion to exclude Rodriguez's statements.

The trial court's ruling was correct. "It is settled . . . that the Sixth Amendment right to counsel is 'offense-specific,' i.e., it attaches only to those offenses for which adversary judicial criminal proceedings have begun." (*People v. Webb* (1993) 6 Cal.4th 494, 527.) "Thus, . . . [Rodriguez's] Sixth Amendment rights had not yet attached in this case and could not have been violated when" he made the incriminating statements to the informants. (*Ibid.*; see also *Texas v. Cobb* (2001) 532 U.S. 162, 169; *Illinois v. Perkins* (1990) 496 U.S. 292, 299 ["In the instant

10

case no charges had been filed on the subject of the interrogation, and our Sixth Amendment precedents are not applicable"].)

On appeal Rodriguez does not contend that his Sixth Amendment right to counsel was violated. Instead, he argues that his due process rights were violated because the informants "acted as surreptitious law enforcement interrogators" and used a "technique of 'deception and manipulation'" to elicit incriminating statements. The theory is forfeited because Rodriguez did not raise it in the trial court. (See *People v. Partida* (2005) 37 Cal.4th 428, 438 ["to the extent defendant asserts a different theory for exclusion than he asserted at trial, that assertion is not cognizable"].) In any event, the theory is devoid of merit. The informants did not act as interrogators who elicited incriminating statements through deception and manipulation. Rodriguez eagerly boasted of his gang-related violent acts to persons whom he believed to be fellow gang members.

*Rodriguez Forfeited Claim that Trial Court Was Denied Opportunity to Strike Firearm Enhancements*

Effective January 1, 2018, Senate Bill 620 amended subdivision (h) of section 12022.53. Before the amendment, subdivision (h) prohibited a court from striking a section 12022.53 enhancement. As amended, the subdivision provides that the court may strike the enhancement "in the interest of justice pursuant to Section 1385."

Rodriguez was sentenced on May 1, 2018, five months after the amendment became effective. He argues, "[T]his court should remand appellant's case for a new sentencing hearing in which the trial court is given the opportunity to strike the firearm enhancements." But at the time of sentencing, Cabrera had the opportunity to move to strike the firearm enhancements. He

11

failed to do so and has consequently forfeited the issue. (See *People v. Carmony* (2004) 33 Cal.4th 367, 375-376 ["any failure on the part of a defendant to invite the court to dismiss [a strike] under section 1385 following [*People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, which allowed the trial court to dismiss a strike,] waives or forfeits his or her right to raise the issue on appeal"].)

In his reply brief appellant contends, "[I]f the issue was indeed forfeited, it was ineffective assistance of counsel not to object and cognizable on direct appeal because there would be no strategic or tactical reason not to challenge a ruling within the sentencing court's discretion." The contention is forfeited because appellant failed to include it in his opening brief. "It is rarely appropriate to resolve an ineffective assistance claim on direct appeal [citation]; we certainly will not do so where, as here, the claim is omitted from the opening brief and thus waived [citations]." (*People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9.)

In any event, appellant has failed to show he was prejudiced by counsel's failure to move to strike the firearm enhancements. Appellant does not argue that there is a reasonable probability the trial court would have granted the motion if counsel had made it. (*Strickland v. Washington* (1984) 466 U.S. 668, 694 ["The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different"].)

*Trial Court's Alleged Failure to Determine Rodriguez's Ability to Pay Restitution Fine and Assessments*

Based on *People v. Dueñas* (2019) 30 Cal.App.5th 1157, Rodriguez claims that the trial court erroneously imposed a section 1202.4 restitution fine of $10,000 without conducting a

12

hearing to determine his ability to pay the fine. "*Dueñas* held that it violates due process under the federal and state Constitutions to impose . . . court operations and facilities fees without first determining the convicted defendant's ability to pay them. [Citation.] In addition, 'to avoid serious constitutional questions' raised by the statutory restitution scheme, [*Dueñas* held that] the [trial] court must stay execution of the mandatory restitution fine unless the court determines that the defendant has the ability to pay it." (*People v. Taylor* (2019) 43 Cal.App.5th 390, 397 (*Taylor*).)[3]

Irrespective of *Dueñas*, the trial court was authorized to consider his ability to pay because the restitution fine exceeded the $300 minimum (§ 1202.4, subd. (c)). (See *People v. Oliver* (2020) 54 Cal.App.5th 1084, 1102 ["in *Taylor*[, *supra*, 43 Cal.App.5th at pp. 399-400], we concluded a defendant forfeited his claim of *Dueñas* error about a *maximum* $10,000 restitution fine by not objecting because, even before *Dueñas* was decided, the trial court had the express authority to consider the defendant's ability to pay as one factor when deciding whether to impose a fine above the [$300] mandatory minimum"].)

---

[3] "Since *Dueñas*, some courts have criticized *Dueñas*'s due process analysis and have declined to follow it. . . . [¶] The California Supreme Court will resolve the split in authority, having granted review of the issues presented by *Dueñas* in [*People v. Kopp* (2019) 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844]. The [Supreme] [C]ourt will decide whether courts must 'consider a defendant's ability to pay before imposing or executing fines, fees, and assessments,' and if so, 'which party bears the burden of proof regarding defendant's inability to pay.'" (*Taylor*, *supra*, 43 Cal.App.5th at p. 398.)

Rodriguez also claims that, without determining his ability to pay, the trial court erroneously imposed a $40 court operations assessment (§ 1465.8) and a $35.00 criminal conviction assessment (Gov. Code, § 70373). In view of Rodriguez's sentence of imprisonment for life without the possibility of parole, the trial court did not err. "'"Ability to pay does not necessarily require existing employment or cash on hand." [Citation.] "[I]n determining whether a defendant has the ability to pay . . . , the court is not limited to considering a defendant's *present* ability but may consider a defendant's ability to pay in the future." [Citation.] This include[s] the defendant's ability to obtain prison wages . . . . [Citation.]' [Citations.]" (*People v. Aviles* (2019) 39 Cal.App.5th 1055, 1076.) "Nothing in this record suggests [Rodriguez] might be unable to work, or that [he] might be ineligible for prison work assignments. As such, we can infer that [he] will have the opportunity to earn prison wages and [he] can start paying these financial obligations. [Citations.] [¶] 'Prison wages range from $12 to $56 per month, depending on the prisoner's skill level.' [Citations.]" (*People v. Lowery* (2020) 43 Cal.App.5th 1046, 1060.)

*Dueñas Does Not Apply to Direct Victim Restitution*

It appears that Rodriguez claims that the trial court erred in not determining his ability to pay direct victim restitution to Lopez's mother and sister as well as restitution of $4,625 to the Victim's Compensation Board for payment of Lopez's funeral and burial expenses. The claim lacks merit. *Dueñas* does not apply to direct victim restitution. (*People v. Evans* (2019) 39 Cal.App.5th 771, 777.) Direct victim restitution includes restitution of funeral and burial expenses paid by the Victim's Compensation Board. (See § 1202.4, subd. (f)(4)(A) ["If, as a

14

result of the defendant's conduct, the Restitution Fund has provided assistance to or on behalf of a victim or derivative victim . . . , the amount of assistance provided shall be presumed to be a direct result of the defendant's criminal conduct and shall be included in the amount of the restitution ordered"].)

*No Abuse of Discretion in Denying*
*Cabrera's Motion to Sever*

Cabrera maintains that the trial court erroneously denied his motion to sever his trial from Rodriguez's trial.  In the motion Cabrera argued that severance was necessary because appellants "have made various statements implicating each other."  He claimed that a joint trial would violate his Sixth Amendment right to confront witnesses and his Fifth Amendment right to due process because he would not have an opportunity to cross-examine Rodriguez.  (Cabrera erroneously assumed that Rodriguez would not testify.)  Cabrera asserted, "A joint trial . . . may be had only if the People abandon their specious effort to hoist Cabrera upon the testimonial hearsay of Rodriguez . . . ."

In their written opposition to the motion, the People argued that the trials should not be severed because appellants' statements were admissible against each other as declarations against penal interest and as declarations of coconspirators in furtherance of the conspiracy.  The People attached transcripts of Rodriguez's statements to CI nos. 1 and 3 along with copies of Cabrera's kites to CI no. 2.  The People used brackets to mark the portions of the transcripts they sought to admit.

At the hearing on the motion, Cabrera's counsel stated: "[T]he confrontation clause bars" the admission of Rodriguez's statements for use against Cabrera "unless I get to cross-examine him."  "My client could be convicted upon [Rodriguez's]

15

accusations." Counsel also argued that trial of the attempted murder charge against Rodriguez (count 2) should be severed because "there's no suggestion that" Cabrera was involved in this crime. Counsel protested that, although the information charged only Rodriguez with the attempted murder, "that smears my client. It spills over onto my client."

As to Cabrera's motion to sever the trial of the murder charge (count 1), the trial court ruled: "The motion . . . is denied. However, . . . we're gonna have to go through all the statements that the People want to offer and make an individual determination as to whether they qualify under the statement against penal interest exception [to the hearsay rule], 'cause I don't think there's any other avenue of admissibility . . . ."

The trial court denied Cabrera's motion to sever the trial of the attempted murder charge against Rodriguez (count 2). The court reasoned: "I don't think it's going to confuse the jury because it's obvious from the evidence that [Cabrera was not] involved in that act [the attempted murder] at all and had nothing to do with it. So I don't see how that would prejudice [him] . . . regarding the completed murder [count 1]."

Cabrera contends that the trial court prejudicially erred in denying his motion to sever. "'Our Legislature has . . . "expressed a preference for joint trials." [Citation.] But the court may, in its discretion, order separate trials "in the face of an incriminating confession [or incriminating admissions], prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony." [Citations.] [¶] We review a trial court's denial of a severance motion for abuse of discretion based on the facts as they appeared

16

at the time the court ruled on the motion.  [Citation.]  If the court's joinder ruling was proper at the time it was made, a reviewing court may reverse a judgment only on a showing that joinder "'resulted in "gross unfairness" amounting to a denial of due process.'"'"  (*People v. Letner & Tobin* (2010) 50 Cal.4th 99, 150.)

"In exercising its discretion in this regard, the [trial] court weighs 'the potential prejudice of joinder against the state's strong interest in the efficiency of a joint trial.  [Citation.]'  [Citation.]  To succeed on a claim that the trial court abused its discretion in denying severance or ordering consolidation, the defendant must make a "'clear showing of prejudice'" and establish that the ruling fell "'"'outside the bounds of reason.'"'"'  (*People v. Merriman* (2014) 60 Cal.4th 1, 37 (*Merriman*).)  "'[T]he benefits of joinder are not outweighed—and severance is not required—merely because properly joined charges might make it more difficult for a defendant to avoid conviction compared with his or her chances were the charges to be separately tried.'  [Citation.]  '[D]efendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials.'"  (*People v. Bryant, Smith & Wheeler* (2014) 60 Cal.4th 335, 381-382 (*Bryant, Smith & Wheeler*).)

In his motion Cabrera argued that severance was necessary because the admission of Rodriguez's statements to the informants would violate his Sixth Amendment confrontation rights.  But the confrontation clause does not apply to nontestimonial statements, and Rodriguez's statements to the informants were nontestimonial.  (See *People v. Arauz* (2012) 210 Cal.App.4th 1394, 1402 (*Arauz*) ["We hold that statements unwittingly made to an informant are not 'testimonial' within the

17

meaning of the confrontation clause"].)  "If a statement is not testimonial, "'it does not implicate the confrontation clause, and the issue is simply whether the statement is admissible under state law as an exception to the hearsay rule.'"" (*People v. Almeda* (2018) 19 Cal.App.5th 346, 362.)

As to the denial of Cabrera's motion to sever the trial of count 2 (attempted murder), the trial court reasonably concluded that the consolidation of counts 1 and 2 would not prejudice him because the evidence clearly showed he had nothing to do with the attempted murder.  (See *People v. Champion* (1995) 9 Cal.4th 879, 905 ["at the time the trial court made its ruling [denying severance], it could reasonably conclude that the evidence of Taylor's murder [charged only against codefendant Ross] would not adversely affect [defendant] Champion at trial" since "no eyewitness had identified defendant Champion as one of Taylor's killers"].)  The murder and attempted murder here were committed at different times and places and involved different victims.  Thus, "[t]here was no danger of confusion from multiple counts." (*People v. Cummings* (1993) 4 Cal.4th 1233, 1286 (*Cummings*), overruled on another ground by *People v. Merritt* (2017) 2 Cal.5th 819, 831.)  The joinder of count 2 was unlikely to inflame the jury's passions because the facts underlying the attempted murder of J.G. were no more inflammatory than the facts underlying the murder of Lopez.

Cabrera maintains that the trial court abused its discretion "because the prosecution joined a strong case against Rodriguez with a weak one against Cabrera."  (Bold omitted.)  The theory is forfeited because Cabrera failed to advance it in the trial court. (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1049 [in claiming that trial court abused its discretion in denying motion to sever,

18

defendant cannot raise argument that he failed to make in trial court].) In any event, the theory lacks merit. (See the discussion, *post*, at pp. 22-24.)

Finally, Cabrera claims that the trial court abused its discretion because it "denied severance based on 'kites' that were later determined to be the involuntary product of coercion . . . ." After the trial court had denied the severance motion, it excluded some of the kites written by Cabrera to CI no. 2. The court concluded that the People had failed to prove that the excluded kites were "free and voluntary and not coerced." Since the subsequently excluded kites were before the trial court when it ruled on the motion to sever, an abuse of discretion cannot be based on its consideration of these kites. (*Merriman, supra*, 60 Cal.4th at pp. 37-38; *People v. Greenberger* (1997) 58 Cal.App.4th 298, 343 [question whether trial court abused its discretion "focuses on what was presented to the trial court at the time it made its decision"].)

Moreover, there is no evidence that the excluded kites were a determining factor in the court's decision to deny Cabrera's severance motion. If Cabrera believed that they were a determining factor, he should have renewed his severance motion after the kites had been excluded. The trial had not yet begun. (See *People v. Ervin* (2000) 22 Cal.4th 48, 68 ["If further developments occur during trial that a defendant believes justify severance, he must renew his motion to sever. Defendant made no renewed motion in this case. Accordingly, he may not raise the point on appeal"].)

19

### *Denial of Severance Motion Did Not*
### *Result in Denial of Due Process*

"[E]ven if a trial court acted within its discretion in denying severance, "'the reviewing court may nevertheless reverse a conviction where, because of the consolidation, a gross unfairness has occurred such as to deprive the defendant of a fair trial or due process of law.'"" (*People v. Thompson* (2016) 1 Cal.5th 1043, 1079.)  "In resolving a claim that joinder resulted in gross unfairness in violation of a defendant's right to a fair trial and due process, [the California Supreme Court has] observed that a judgment will be reversed on this ground only if it is 'reasonably probable that the jury was influenced [by the joinder] in its verdict of guilt.'" (*Merriman, supra*, 60 Cal.4th at p. 49.) "[W]e conclude there was no reasonable probability that the joinder of counts tainted the jury's verdicts in this case." (*Ibid.*)

Cabrera claims that he was denied due process because "[t]he evidence produced at trial led to [his] conviction based on his association with Rodriguez . . . ."  But "[s]ince [appellants] were crime partners . . . in the murder, rejudicial association with a codefendant is not a factor." (*Cummings, supra*, 4 Cal.4th at p. 1286; see also *Bryant, Smith & Wheeler, supra*, 60 Cal.4th at p. 383 ["Individuals who choose to commit crimes together are not generally entitled to shield the true extent of their association by the expedient of demanding separate trials"].)  Furthermore, "it does not appear the jury would have found [Rodriguez's] characteristics or culpability so overwhelming compared to [Cabrera's] that it convicted [Cabrera] simply because of his association, rather than because his individual guilt had been prove[n]." (*Ibid.*)

Cabrera asserts "it is reasonably probable that [he] would not have been convicted absent the prosecution's joining the strong case against Rodriguez with the weak one against Cabrera."  "The core prejudice concern arising in connection with this issue is that jurors may aggregate evidence and convict on weak charges that might not merit conviction in separate trials." (*People v. Simon* (2016) 1 Cal.5th 98, 127 (*Simon*).)  But "[t]his was not a matter in which a weak case was joined with a strong case, . . . thereby 'causing a spillover effect that might have unfairly altered the outcome of the trial.'  [Citation.]" (*People v. McKinnon* (2011) 52 Cal.4th 610, 631.)  In the next section of this opinion, we show that Rodriguez's statements to the informants were properly admitted against Cabrera under the declaration against penal interest exception to the hearsay rule.  Thus, Rodriguez's statements would have been admissible in a separate trial of Cabrera.  Based on Rodriguez's and Cabrera's statements, "[s]trong evidence supported both cases." (*Ibid.*)  In one of his kites passed to a fellow inmate, Cabrera said he was "worried . . . the investigators will link him to [the] shooting" of Lopez.  Cabrera had no cause for concern if he was not involved in the shooting.   Moreover, Cabrera had a motive to kill Lopez because he believed Lopez was "a straight river rat," i.e., a member of the rival El Rio gang.  A gang expert testified that killing a rival gang member is "kind of like the Holy Grail [in gang culture]. . . . That's what [is] gonna elevate your status the most within your neighborhood, within your gang . . . ."

In addition, about two weeks after the shooting, Cabrera possessed a loaded .22 caliber single-action revolver that could have fired the bullet recovered from the door of a car parked at the scene of the shooting.  Accordingly, the murder charge

against Cabrera was not "a weak case that needed joinder to bolster the likelihood of conviction." (*Simon, supra,* 1 Cal.5th at p. 127.)

*Rodriguez's Statements Were Properly Admitted*
*Against Cabrera as Declarations Against Penal Interest*

Rodriguez's statements to the informants were admitted against Cabrera under the declaration against penal interest exception to the hearsay rule. The exception is set forth in Evidence Code section 1230, which provides in relevant part: "Evidence of a statement by a declarant . . . is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of . . . criminal liability, . . . that a reasonable man in his position would not have made the statement unless he believed it to be true." Cabrera argues that the trial court erred in admitting Rodriguez's statements under this exception. "We review a trial court's decision about whether a statement is admissible as a declaration against penal interests for abuse of discretion. [Citations.] Thus, the trial court's decision ""will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.""" (*People v. Vasquez* (2012) 205 Cal.App.4th 609, 620.)

Cabrera contends: "The first problem with Rodriguez'[s] statements was that he was not unavailable. He testified." The unavailability issue is forfeited because Cabrera failed to raise it below. (Evid. Code, § 353, subd. (a).) Even if the issue were preserved for appellate review, the trial court did not abuse its discretion. Whether a court acted within its discretion is based on the facts known to the court at the time it exercised discretion.

22

(*Merriman, supra*, 60 Cal.4th at pp. 37-38.) When it ruled that Rodriguez's statements were admissible against Cabrera, the trial court did not know and had no reason to know that Rodriguez would testify. Counsel for a subsequently dismissed codefendant, Jesus Morales, said, "They [the People] have to show the declarant is unavailable, . . . [and] we're assuming that the codefendants [Cabrera and Rodriguez] are going to take the 5th Amendment right against testifying." No one disputed counsel's assumption.

Cabrera claims, "[T]he section 1230 exception applies to nonparties, not defendants." This claim is wrong on the law. (See *Arauz, supra*, 210 Cal.App.4th at pp. 1397, 1400-1401 [declaration against penal interest exception applies to codefendant's incriminating statements].)

Next, Cabrera maintains that Rodriguez's statements implicating Cabrera did not qualify as declarations against penal interest because they "tended to shift or spread blame toward Cabrera and thus served Rodriguez'[s] interests" by "mitigat[ing]" his "culpability." Cabrera focuses on "Rodriguez'[s] insistence that it 'was Alex [Cabrera] who had the fucking idea.'"

The trial court ruled that Rodriguez "didn't shift the blame" when he said it was Cabrera's idea. The court explained, "Well, maybe [Cabrera] came up with the idea, but I don't think [Rodriguez] relieved himself of any responsibility by going, 'Yeah, let's go do it.' . . . He's just as culpable." "[If] you say, 'Let's go rob a bank' and I go, 'That's a great idea,' we're both going down."

Rodriguez's statements implicating Cabrera must be considered in the context of his entire conversation with CI no. 3. "[C]ontext matters in determining whether a statement or portion thereof is admissible under the against-interest

23

exception." (*People v. Grimes* (2016) 1 Cal.5th 698, 717 (*Grimes*).) "Ultimately, courts must consider each statement in context in order to answer the ultimate question under Evidence Code section 1230: Whether the statement, even if not independently inculpatory of the declarant, is nevertheless against the declarant's interest, such that 'a reasonable man in [the declarant's] position would not have made the statement unless he believed it to be true.'" (*Id*. at p. 716.)

The trial court did not abuse its discretion in admitting Rodriguez's statement that the attack on Lopez was Cabrera's idea. Considering his statement in its context, the court reasonably concluded that Rodriguez was not trying to minimize his role or shift the blame onto Cabrera. Rodriguez clearly took credit for the killing. Rodriguez told CI no. 3 that, when he and Cabrera saw Lopez, he asked Cabrera, "'[W]hat's up? Should we give it gas or what?'" Cabrera responded, "'[L]et's go for it.'" Thus it was Rodriguez, not Cabrera, who broached the idea of attacking Lopez. Rodriguez continued, "I asked [Lopez], 'what's up, where are you from?'" When Lopez said he was from El Rio, "we just started dumping at him." "I told [Lopez] 'fuck you, fool, this is Colonia gang, what's up motherfucker?' And we just started dumping on him, boom, boom . . . ."

Even if the trial court had erred in admitting Rodriguez's statement that the attack on Lopez was Cabrera's idea, the error would have been harmless in view of Rodriguez's numerous other statements that he and Cabrera had acted in concert in shooting Lopez. These other statements were properly admissible as declarations against penal interest because they were inextricably intertwined with Rodriguez's account of his involvement in the shooting. (See *Grimes*, *supra*, 1 Cal.5th at p.

24

715 ["we have permitted the admission of those portions of a confession that, though not independently disserving of the declarant's penal interests, also are not merely 'self-serving,' but 'inextricably tied to and part of a specific statement against penal interest'"].)

Finally, Cabrera asserts that Rodriguez's statements implicating him were not "sufficiently trustworthy to justify their admission." (Bold omitted.) "[E]ven when a hearsay statement runs generally against the declarant's penal interest . . . , the statement may, in light of circumstances, lack sufficient indicia of trustworthiness to qualify for admission." (*People v. Duarte* (2000) 24 Cal.4th 603, 614 (*Duarte*).) Cabrera argues that Rodriguez's statements were not sufficiently trustworthy because Rodriguez blamed Cabrera for his arrest, Rodriguez's account of his arrest was inaccurate, and Rodriguez's account of Cabrera's involvement in the shooting was prompted by the informants' "leading questions and narrative statements." "Because the defense did not object on this ground at trial, the issue is not preserved for appellate review. (Evid.Code, § 353, subd. (a).)" (*People v. Kipp* (2001) 26 Cal.4th 1100, 1124.)

If the issue had been preserved for appellate review, Rodriguez's statements to the informants had sufficient indicia of trustworthiness to warrant their admission. This is not "'a situation where a declarant in police custody seeks to exculpate himself by implicating another suspect.'" (*Duarte*, *supra*, 24 Cal.4th at p. 618.) Rodriguez implicated himself. He freely made the statements in a noncoercive environment to persons whom he believed to be fellow gang members. (See *People v. Tran* (2013) 215 Cal.App.4th 1207, 1217 [in determining trustworthiness of declaration against penal interest, "'the most reliable

25

circumstance is one in which the conversation occurs between friends in a noncoercive setting that fosters uninhibited disclosures"]; *People v. Masters* (2016) 62 Cal.4th 1019, 1056 [""""Declarations against penal interest are received notwithstanding that they were spoken in confidence in the expectation they would not be repeated to the authorities. [Citations.] Indeed, that makes such declarations more trustworthy"""].)

*Amendment of Abstracts of Judgment*

Although the trial court ordered Rodriguez to pay restitution of $5,481.89 to Lopez's sister, S. L., the abstract of judgment omits the order. The People request that Rodriguez's abstract be amended to correct this omission. We grant the request. As to both appellants, the abstracts of judgment must be amended to reflect our striking of the 20-year determinate terms imposed for the firearm enhancements pursuant to section 12022.53, subdivision (c).

*Disposition*

As to both appellants, the judgments are modified to strike the 20-year term imposed on count 1 (first degree murder) for the firearm enhancement pursuant to section 12022.53, subdivision (c). In all other respects, the judgments are affirmed. The trial court shall amend the abstracts of judgment as indicated in the preceding section of this opinion entitled "*Amendment of Abstracts of Judgment.*" The trial court shall send a certified copy of the amended abstracts of judgment to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED.


YEGAN, Acting P. J.


We concur:


PERREN, J.


TANGEMAN, J.

Charles W. Campbell, Jr., Judge

Superior Court County of Ventura

_____

Keiter Appellate Law and Mitchell Keiter, under appointment by the Court of Appeal, for Defendant and Appellant Cabrera.

Diane E. Berley, under appointment by the Court of Appeal, for Defendant and Appellant Rodriguez.

Xavier Becerra, Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill, Supervising Deputy Attorney General, Heidi Salerno, Deputy Attorney General, for Plaintiff and Respondent.